SCIOTO LIVESTOCK SALES COMPANY *v.* CHARLEY CROCKETT

(No. 7920)

Submitted January 29, 1935. Decided February 5, 1935.

*Gordon Phillips* and *F. F. Scaggs*, for plaintiff in error.
*Jess Hammock* and *J. T. Lambert*, for defendant in error.

HATCHER, JUDGE:

The defendant, Crockett, a resident of West Virginia, purchased thirty-six hogs from the plaintiff Sales Company at Chillicothe, Ohio, giving in payment a check of $126.00. The hogs died within a month afterwards, and he stopped payment on the check. Plaintiff brought this action before a justice to recover the sales price of the hogs.

The defendant filed a written answer before the justice alleging that the hogs were infected with cholera when he bought them, and that he had been put to trouble and expense by reason thereof amounting to $150.00, and praying judgment therefor against the plaintiff. The justice found for the plaintiff and defendant appealed to the circuit court. Pending the trial there, the defendant filed an itemized statement of his demands against the plaintiff amounting to $96.00. The jury returned a verdict in favor of defendant and assessed his damages at $126.00. The defendant disclaimed the verdict in excess of $96.00 and the court then entered judgment in favor of defendant for that sum. The plaintiff secured a writ of error.

The plaintiff complains of the procedure in the circuit court. Since the case originated before a justice, the formality of a common law trial was not requisite. While the procedure complained of was informal to some extent, the record discloses no prejudice to the plaintiff therefrom.

The plaintiff takes the position that the defendant purchased the hogs at his own risk and invokes the rule of *caveat emptor*. Plaintiff's evidence would sustain its position; but both defendant and his son testified positively that plaintiff's general manager personally selected the hogs and expressly guaranteed them to be free from disease. Because of the verdict in favor of defendant, we must regard the guaranty as having been made.

The defendant had the hogs vaccinated against cholera immediately after his purchase. The vaccination was performed by a veterinarian of Chillicothe, who testified that he examined the hogs and found them to be "in excellent condition" showing "no trace of either cholera or pneumonia." His testimony completed a *prima facie* case for plaintiff even under the guaranty testified to by the defendant. The latter sought to break down that case by the following evidence: One of the hogs died the day following the purchase; by the fifth day after the purchase five or six had died, and a West Virginia veterinarian, summoned on that day, pronounced the malady to be cholera; and within about a month after the purchase all were dead. The West Virginia veterinarian

first stated that in his opinion the hogs were infected with cholera when delivered to defendant; but later the veterinarian admitted that he could not say whether the hogs contracted the disease from other hogs or whether they acquired it after delivery through the vaccination in Chillicothe.

The Chillicothe veterinarian did not give the details of the vaccination further than to say: "I gave them (the hogs) the single treatment, as under West Virginia regulations, hogs are not allowed to pass over the state line that have just had the double treatment. * * * I told the owner (defendant) to have the hogs treated again after he got them home." That evidence is not denied. The West Virginia veterinarian explained the double treatment as follows: "* * * in vaccinating hogs that are in perfect health we use what we call the virus— that is, live germs—and serum to counteract those live germs is injected, and we set up hog cholera and the serum cures it, what we set up. If the veterinarian should inject those live germs and not enough serum, then the virus will take hold and they will take hog cholera in four or five days; but to turn some healthy hogs in close to diseased hogs it takes around nine days for them to contract it." He further said that cholera resulting from an injection of the virus "will be more rank, because it will get into the blood stream immediately, when the other way it has to go to the digestive tract and be absorbed by the blood stream and come on the hog gradually."

Defendant's evidence discloses that he purchased the hogs on February 12, 1932; that after the hogs were vaccinated he left Chillicothe with them about 6:00 P. M. in an open truck with latticed sides, and arrived at his home 140 miles distant sometime after midnight; that the night was cold and that he left the hogs in the truck until after his breakfast the following morning. The plaintiff's manager testified that he had been a farmer and stockman all his life and that he knew there was always some danger of a hog's contracting pneumonia after vaccination for cholera. That testimony is confirmed by the West Virginia veterinarian, who also testified that of the three hogs he examined (post mortem) on the

fifth day after the purchase, two of them showed symptoms of pneumonia as well as cholera.

Instead of having the second treatment (the serum) administered the next morning after he arrived home, as he was directed by the Chillicothe veterinarian, the defendant never had it given and never even summoned a veterinarian until the fifth day after the first treatment. At that time, the veterinarian found the herd exactly in the condition which he said should be manifested four or five days after an inoculation of the virus alone. He did not examine any of the hogs which had died prior to the fifth day, and the record does not disclose or give any data for determining with precision what destroyed the hogs during the first four days. He admitted that the exposure to which the hogs were subjected on the night they were brought to defendant's home might have caused one or two of them to have pneumonia. It seems plausible that the hogs dying on the first day or so had pneumonia, and that the others had cholera set up by the uncounteracted vaccination virus. Or, if it be insisted that the first deaths were also attributable to cholera, the more rapid progress of the disease could have been caused by overdoses of the virus (as we understand the evidence of the West Virginia veterinarian). Even the latter theory is more plausible than the conjecture that cholera so far advanced as to kill within eighteen hours, would have been completely overlooked by the Chillicothe veterinarian. Either of the theories which we favor is consistent with the testimony of the Ohio veterinarian that the hogs were sound when vaccinated, and do not affect the plaintiff's *prima facie* case.

The record discloses no excuse for the negligence of the defendant. There is not a line explaining his failure to protect the hogs from exposure the night of their vaccination, or his failure to have them given the second treatment, or his failure to procure a veterinarian until after the herd was beyond medical help. His own inattention saps his defense.

The judgment of the circuit court is therefore reversed, the verdict of the jury set aside, and a new trial awarded the plaintiff.

*Judgment reversed; verdict set aside; new trial awarded.*