RUTH I. OATES

*v.*

CONTINENTAL INSURANCE COMPANY

(No. 10417)

Submitted September 16, 1952. Decided November 11, 1952.

502

*H. R. Athey* and *H. G. Shores,* for plaintiff in error.

*Steptoe & Johnson, James M. Guiher* and *Kingsley R. Smith,* for defendant in error.

RILEY, PRESIDENT:

Ruth I. Oates instituted in the Circuit Court of Mineral County this action on a renewal policy of fire insurance, issued by the defendant, Continental Insurance Company, through its insurance agency at Keyser, dated November 12, 1949, covering five thousand dollars on plaintiff's frame dwelling house, located near Fort Ashby, Mineral County, and two thousand dollars on the contents thereof. Plaintiff prosecutes this writ of error to an order of the Circuit Court of Mineral County, which set aside a jury verdict in her favor in the amount of $5,662.26, and granted the defendant, Continental Insurance Company, a new trial.

About April 30, 1949, plaintiff secured a loan from the Family Finance Company of Cumberland, Maryland. To protect its loan the finance company required that plaintiff take out a fire insurance policy in the amount of one thousand dollars, covering the contents of the. dwelling, and containing a mortgage clause in favor of the finance company. A policy was secured from Northwestern National Insurance Company, through its agent at Largent, West Virginia, which named the plaintiff as the insured, and secured the mortgagee under the mortgage clause in the amount of one thousand dollars from loss by fire on the contents of the dwelling. This policy extended for a period of three years. Shortly thereafter, plaintiff paid off the Family Finance Company with money secured from Household Finance Corporation, of Cumberland, Maryland, and, on October 18, 1949, the

latter company, not requiring insurance, turned the Northwestern policy over to plaintiff.

At the time the Northwestern policy was delivered to plaintiff, the policy originally issued by Continental was about to expire, and the insurance agency at Keyser, which had sold the policy to plaintiff, advised her of the approaching expiration date, and enclosed a renewal policy for an additional one year, upon which policy this action is based. This renewal policy, like the original policy, insured plaintiff's dwelling in the amount of five thousand dollars and the contents thereof in the amount of two thousand dollars, and contained a mortgage clause in favor of The Farmers and Merchants Bank, Keyser, West Virginia. Mrs. Oates accepted the renewal policy and paid the premium on it.

The Northwestern policy, issued by the insurance agency at Largent, and the original and renewal policies of Continental, issued by the insurance agency at Keyser, contained conditions against other insurance. Neither of the two insurance agencies issuing the policies had any knowledge of any policy written by the other agency.

On February 10, 1950, fire completely destroyed plaintiff's dwelling house and its contents. Thereafter, plaintiff filed proofs of loss on the Continental and Northwestern policies. The claims set forth therein not having been honored, plaintiff instituted in the Circuit Court of Mineral County separate actions on the Continental and Northwestern policies.

In the action instituted against it, each insurance company filed a plea charging incendiarism, and a specification of defense, alleging that plaintiff had other insurance on her property.

The two actions were consolidated by a court order, and tried together. At the trial plaintiff testified that both policies, the Northwestern and the renewal policy issued by the Continental Insurance Company, were in effect at the time of the fire. The consolidated cases

having been submitted to a jury, a verdict was rendered in plaintiff's favor in the amount of $5,662.26 against Continental Insurance Company and a verdict of $635.27 against Northwestern National Insurance Company. Thereupon each of the defendants moved the court to set aside the verdict returned against it, and to grant a new trial. By the final order, entered on February 19, 1951, to which this writ of error was awarded, the circuit court made its written opinion a part of the record, which opinion stated that the question whether the fire was caused by incendiarism on plaintiff's part was for jury determination, but the verdicts should be set aside and a new trial awarded on the ground that plaintiff had violated the conditions as to "other insurance" contained in both policies. By its order the circuit court sustained both motions to set aside the verdicts and awarded a new trial to each defendant; and, further, the order, after reciting that plaintiff made no resistance to the motion of the defendant, Northwestern National Insurance Company for a new trial, and that plaintiff's counsel "having stated to the court, since the handing down of the court's written opinion aforesaid, that plaintiff does not desire or intend to prosecute further the action against" the defendant, Northwestern National Insurance Company, ordered that plaintiff's action against that defendant be dismissed with costs to that defendant.

As against the charge of incendiarism the plaintiff sought to establish an alibi. She testified that some time prior to February 8, 1950, she received a telephone call advising her of the illness of her brother who, she claimed, was living in Baltimore. She testified that for the purpose of going from Keyser to Baltimore, she drove north to Bedford, Pennsylvania, left her automobile in a garage there, and took a bus to Baltimore, arriving there about 2:30 in the morning of February 9, 1950. She further testified that she was unable to find her brother in Baltimore and spent the balance of the day of the ninth shopping; that on February 9 she left Baltimore by bus about nine o'clock at night, arriving at Bedford shortly after

midnight on February 10; that there she picked up her car at the garage and started to drive south toward Keyser; that, after driving a few miles in the direction of Cumberland, she decided to return to Baltimore and look further for her brother; and that when she arrived at Bedford, she took a bus from that place to Baltimore about five o'clock on the morning of the tenth.

The record discloses that by paved road in good repair it was about forty-nine miles from Bedford to plaintiff's dwelling house.

Charles Bingham, a witness for both defendants and a mechanic at the Ford garage in Bedford, testifed that about one or two o'clock on the morning of February tenth, plaintiff put her automobile in storage at that garage, telling witness that she had just got back from Baltimore; that the automobile had an oil leak; that he checked the oil and sold plaintiff two or three quarts of oil and at that time she asked him "if that oil would run her to Keyser, if there was any chance of burning the car up." Defendants' witness, Clair Koontz, a mechanic and assistant shop foreman in the Thomas Chevrolet garage at Bedford, testified that plaintiff brought her automobile to that garage about six o'clock on the morning of February tenth, and that she told this witness she wanted to leave it there for three days' storage, and to have it washed and cleaned inside and out; that she said the car had an oil leak but she did not want it repaired, as she was going to get another one in about two weeks; that when she arrived at the garage that morning the car was about "a quart low of oil" and the motor was hot. John Howsare, a mechanic at the Thomas Chevrolet garage in Bedford, testified that shortly before 5:55 on the morning of February 10, 1950, plaintiff brought her automobile to that garage, and at her request he drove her to the bus station at Bedford in time for her to board the bus leaving for Baltimore at 5:55 that morning; and that while witness was driving plaintiff to the bus station she told him she had an oil leak in the automobile, but did not want it repaired because she was trading it in on another auto-

mobile; and that after witness brought the automobile back to the Thomas Chevrolet garage, the oil was checked and found to be "a quart low" and the motor was very hot.

Though Mrs. Oates testified initially that she received news of her brother's illness by telephone, when she was reminded by the Deputy State Fire Marshal and members of the Department of Public Safety, who investigated the cause of the fire, that she had told them that the news of the illness of her brother had come to her by letter, she testified that she received such a letter. If such a letter was received by her, it was not produced at the trial, and the failure to produce it remains unexplained in this record.

On rebuttal plaintiff testified that after arriving at Bedford by bus shortly after midnight on February tenth, she took her automobile from the (Ford) garage in Bedford, and, after proceeding in the direction of Keyser for some distance, she returned to Bedford about four or four-thirty o'clock on the morning of the tenth, when she took her automobile to the (Thomas) Chevrolet garage at Bedford, and then was taken to the bus station, evidently by one of the employees at the Thomas Chevrolet garage.

When the Fort Ashby volunteer fire department arrived at the scene of the fire on February 10, 1950, they found it beyond control, the dwelling house having practically burned down; and that an oil valve inside the house had been opened by someone, whose identity is not disclosed by this record, so that the oil would be released on the floor.

Charles E. Anderson, a witness for the defendant, who lived on a farm adjoining the Oates property, testified that when he was awakened by the light of the fire between four-thirty and five-thirty on the morning of February 10, 1950, he went to the burning dwelling as soon as he had put on his clothes. When he arrived there, he testified the dwelling was "pretty well gone. The roof

was already caved in and the whole thing was afire." When witness reached the burning dwelling, the Fort Ashby fire department was there.

Douglas Deremer, chief of the Fort Ashby Volunteer Fire Department, testified that when he arrived at the scene of the fire "the cottage had burned clear down, in other words, it was practically gone"; and the assistant fire chief, James Alkire, testified to the same effect. All three of these witnesses testified that they noticed fresh tire prints on the approach which leads from the public road to the dwelling house. The witness Anderson testified that he noticed that the tire prints were fresh on the approach, and that it had rained that night. On cross examination Anderson stated that he could not say whether the tire prints had been there two or three days before. Deremer and Alkire testified that on returning to the scene of the fire about eight o'clock on the morning of February tenth, they noticed tire marks on the approach from the public road to the cottage. The former testified: "The tire imprint was very plain, due to the fact that it had rained the previous evening. The tracks were very fresh, and the right front tire was a diamond tread, a Goodyear I would suggest, partly worn on the inside." Alkire testified that the tire marks were plain and clear, and appeared fresh. Deremer testified that he did not know whether the tire marks had been made by plaintiff's automobile, and Alkire's testimony is silent on that question.

The Chief of the Fort Ashby Volunteer Fire Department, the Deputy Fire Marshal, and the members of the Department of Public Safety, who investigated the fire, expressed the opinion that it was of incendiary origin.

The circuit court in its written opinion stated that plaintiff had two motives for committing arson: (1) She was decidedly over-insured; and (2) she was greatly indebted, as the two proofs of loss filed with the insurance companies show that at the time of the fire there was a lien indebtedness of $7,430.70 against the insured property.

Two issues are presented in this record: (1) Was the evidence adduced in support of plaintiff's theory of the case bearing on the establishment of an alibi so plainly insufficient or incredible as to have warranted the circuit court in refusing to set aside the jury verdict on the ground of the insufficiency of the evidence; and (2) did the circuit court err in awarding defendant, Continental Insurance Company, a new trial because the condition of the policy prohibiting "other insurance" was violated?

The question whether the plaintiff set fire to her dwelling house, which is the basis of the first issue before this Court, was not briefed by counsel for plaintiff, and counsel for defendant gave very little attention to it in its brief and oral argument, so it seems to us that this issue can be disposed of in this opinion without much discussion.

The evidence tending to show that the plaintiff deliberately set fire to the dwelling house in order to collect under the two policies of insurance may be summarized as follows: (1) The fire chief, the deputy fire marshal, and the members of the Department of Public Safety, who investigated the origin of the fire, all testified that in their opinions the fire was deliberately set; (2) though the house was locked with new locks on the doors to which plaintiff had the only key, an oil valve had been opened inside the house which permitted inflammable liquid to spread over the floor; (3) the property was over-insured and plaintiff was heavily indebted; (4) plaintiff's narration of her whereabouts in the early morning hours of February 10, 1950, the day of the fire, is somewhat contradictory, and may be, as the circuit court said in his opinion, "fictional"; (5) when plaintiff brought her automobile back to Bedford, after proceeding for some distance in the direction of Keyser, on the morning of the fire, about six o'clock, according to the employees of the garage, and between four and four-thirty, according to plaintiff's testimony, the motor of the automobile was noticeably hot, which counsel for plaintiff say indicates "fast and continuous driving"; and (6) tire marks were found on

510

the approach from the public road to the dwelling house, which appeared to some witnesses to be "fresh."

On the basis of the undisputed evidence that, though the house was equipped with new locks on the doors, to which plaintiff had the only key, an oil valve had been opened inside the house which permitted inflammable liquid to spread over the floor, it is reasoned by counsel for defendant that the fire was the result of an "inside job." On the basis of evidence, likewise undisputed, plaintiff left Bedford shortly after midnight on the morning of February 10, 1950, driving her automobile in the direction of Keyser, and when she returned to Bedford about six o'clock that morning, the motor of her automobile was hot, counsel for the defendant reason that the question whether plaintiff on February 10, 1950, drove from Bedford to her dwelling house, set fire to it, and returned to Bedford in time to board a bus for Baltimore early that morning, was not for jury determination.

The fire may have been, as counsel for defendant say, an "inside job"; but that conclusion does not follow from the facts portrayed by this record. It is merely an hypothesis asserted by defendant's counsel. When plaintiff's witness, Charles E. Anderson, a neighbor of plaintiff, arrived at the scene of the fire, he testified that the Fort Ashby Fire Department was there, and that "the roof had caved in and the whole house was afire." Deremer, who arrived at the fire before Anderson, testified that "The cottage had burned clear down * * *." So the record is silent on the question whether the plaintiff by the use of her key entered the house and opened the oil valve, or whether someone else, during her absence by forceful means, entered the house and opened the oil valve. Likewise the record is silent, except for plaintiff's testimony, on the question whether before leaving for Bedford for the purpose of going to Baltimore, plaintiff carelessly left the oil valve open. That the motor of plaintiff's automobile was hot when she returned to Bedford after driving in the direction of Keyser early on the morning of February tenth, a fact fully established by this record,

is explained by the fact, equally well established by the evidence, that the automobile was old and had an oil leak. And there is no probative evidence in this record tending to establish that the tire marks observed on the approach leading from the public road to the dwelling house were made by plaintiff's automobile on the morning of the fire. The evidence bearing on the question whether plaintiff set fire to her dwelling house during the time she drove from Bedford in the direction of Keyser on the morning of the fire and the time she returned and boarded a bus for Baltimore, is, in our opinion, highly conjectural in its nature; and while the evidence is of probative force in the sense that it was proper to admit it, it does not present such state of facts from which the jury could reasonably decide between the hypothesis asserted by counsel for plaintiff and that asserted by counsel for the defendant. That being so, the evidence adduced by the defendant, Continental Insurance Company, tending to show that plaintiff burned, or caused to be burned, her dwelling house, as well as the evidence introduced by the plaintiff bearing on the same question, is not of sufficient probative force to qualify it for jury appraisement. In *Johnson* v. *Commonwealth,* 29 Gratt. 796, 817, the Court of Appeals of Virginia accepted, with approval, the holding of the High Court of Errors and Appeals of Mississippi in the case of *Algheri* v. *The State of Mississippi,* 25 Miss. 584, 589: " 'Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof, however great the probability may be.' 1 Stark. on Ev. 572." In *Scioto Livestock Sales Co.* v. *Crockett,* 116 W. Va. 27, syl., 178 S. E. 427, this Court held: "A *prima facie* case is not overcome by evidence which merely affords a bare conjecture to the contrary." And in *Turk* v. *McKinney,* 132 W. Va. 460, 52 S. E. 2d 388, this Court held that a jury will not be permitted to base findings of damages upon conjecture or speculation. See also *Lambert* v. *Metropolitan Life Ins. Co.,* 123 W. Va. 547, 17 S. E. 2d 628; *Legg* v. *Junior Mercantile Co.,* 105 W. Va. 287,

142 S. E. 259; *Chambers* v. *Spruce Lighting Co.*, 81 W. Va. 714, 95 S. E. 192; *Edwards* v. *Hobson,* 189 Va. 948, 54 S. E. 2d 857; and *Moore* v. *Chesapeake & Ohio Railway Co.,* 340 U. S. 573, 71 S. Ct. 428, 95 L. ed. 547.

In discussing the distinction between a finding of fact, based upon a reasonable inference, and a finding of fact, based upon conjecture, the Supreme Court of Alabama in the case of *Southern Ry. Co.* v. *Dickson,* 211 Ala. 481, 100 So. 665, used this very apt language: "* * * As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."

As heretofore noted the Northwestern policy had a one thousand dollar coverage on the contents of plaintiff's dwelling; and the Continental policy, in addition to the coverage of five thousand dollars on the dwelling itself, had a coverage of two thousand dollars on the same risk. As the Continental policy was written at a gross premium of $60.20 and the dwelling, as well as the contents thereof covered by the policy, was exposed to the same risk, the Northwestern policy, if it constitutes "other insurance" serves to invalidate the Continental policy in its entirety. In *Jackson* v. *Grange Mutual Fire Ins. Co.,* 107 W. Va. 304, 148 S. E. 125, pt. 1 syl., this Court held: "Where two or more classes of property, separately valued, and upon which a gross premium is paid, included in a contract of fire insurance, are so situated in respect to each other that the risk is common to all, then the breach of a condition increasing the risk as to one works a forfeiture of the entire contract." The Continental policy is in the standard

form prescribed by Code, 33-4-7, as amended and reenacted by Section 7, Article 4, Chapter 73, Acts of the Legislature, 1945, and Section 7, Article 4, Chapter 72, Acts of the Legislature, 1949, which contains the following provision regarding "other insurance," which substantially conforms to the provision of said Section 7: "Other insurance may be prohibited or the amount of insurance may be limited by endorsement attached hereto." This policy bears the following endorsement as to the prohibition of "other insurance":

> "Total insurance permitted warranted concurrent herewith, including this policy, as follows: $5,000.00 on Dwelling; $2,000.00 on H. & P. Property.
>
> "It is understood and agreed that no insurance in addition to this policy is permitted unless the total insurance, including this policy, is entered in paragraph above."

Like provisions have been consistently upheld by this Court. *Teter* v. *Franklin Fire Ins. Co.,* 74 W. Va. 344, 82 S. E. 40; *Jackson* v. *Grange Mutual Fire Ins. Co., supra;* and *Heldreth* v. *Federal Land Bank of Baltimore,* 111 W. Va. 602, 163 S. E. 50. In point 1 of the syllabus of the *Heldreth* case, this Court held: "An insurer, not having consented in writing to additional insurance, may legally deny liability under a fire insurance policy containing a covenant against additional insurance, where it appears that at the time of obtaining the policy there was such other insurance." And at page 604 of the opinion, this Court stated the reason which prompted it in upholding the provisions in fire insurance policies prohibiting "other insurance," in the following language: "Such condition is deemed reasonable and proper because the moral hazard should not be increased without the knowledge of the insurer. It is considered that not infrequently the motive for the preservation of property decreases as insurance mounts."

Though counsel for the plaintiff in the trial court took inconsistent positions with reference to the Northwestern

policy, the final position asserted is that the Northwestern policy did not constitute "other insurance" within the provisions of the Continental policy, because the former policy is void. That plaintiff by her conduct accepted and ratified the Northwestern policy so that it became "other insurance" within the meaning of the inhibitory provision of the Continental policy is clear from this record. She accepted the Northwestern policy from Family Finance Corporation, when the indebtedness owing that company had been paid off. Shortly after the fire she filed proofs of loss on the Northwestern policy; instituted an action on the policy; prosecuted the consolidated cases to verdicts in her favor on both policies; and at the trial testified that the policy was in full force and effect at the time of the fire. Clearly she ratified the policy, and it is equally clear that that policy constituted "other insurance." To the effect that the filing of proof of loss on a policy and the bringing of action thereon constitute ratification thereof, see *American Ins. Co.* v. *Hattaway*, 194 Ga. 15, 20 S. E. 2d 406; *Gnat* v. *Westchester Fire Ins. Co.*, 167 Wis. 274, 167 N. W. 250; *Aetna Insurance Co.* v. *Jeremiah*, 187 F. 2d 95 (C. C. A. 10). And this Court in *Hollywood Lumber & Coal Co.* v. *Dubuque Fire & Marine Insurance Co.*, 80 W. Va. 604, 611, 92 S. E. 858, said: "Moreover, it is well settled by abundant authority that a principal may ratify the unauthorized act of his agent even after the fire." In view of the foregoing authorities, we are of the opinion that plaintiff ratified the Northwestern policy.

Counsel for plaintiff cite *Woolpert* v. *Franklin Insurance Co.*, 42 W. Va. 647, 26 S. E. 521, and *Wolpert* v. *Northern Assurance Co.*, 44 W. Va. 734, 29 S. E. 1024, cases decided by this Court more than fifty years ago, both of which involve the same plaintiff, though the name of the plaintiff is spelled differently. Unlike the instant case, it is admitted in both of these cases that the other policies relied upon by the defendant insurance companies to constitute "other insurance" prohibited by the conditions of the policies in those cases, were invalid. In *Woolpert* v. *Franklin Insurance Co., supra,* at page 657 of the opinion,

the Court stated: "It appears to be conceded that the policies taken by the plaintiff in error subsequent to the policy taken out from the defendant in error were void and invalid * * *."; and in *Wolpert* v. *Northern Assurance Co., supra,* at page 738 of the opinion, it is stated: "* * * it is agreed upon the record that said policy [a policy of fire insurance issued by Manchester Fire Assurance Company of Manchester, England, of subsequent date to the policy involved in this case] was invalid, and could not be enforced."

In point 2 of the syllabus of the *Woolpert* case, this Court held: "It is a general principle of law that in order to avoid a policy on account of subsequent insurance, against an express condition therein, it must appear that such subsequent insurance is valid, and can be enforced. If it can not be enforced, it is no breach of the condition of the prior policy." Though syllabus 2 of the *Woolpert* case has not been expressly overruled by this Court, neither the holding therein nor the principle enunciated therein is the current holding of this Court. In *Heldreth* v. *Federal Land Bank of Baltimore, supra,* decided on February 23, 1932, at page 604 of the opinion, this Court said: "It will be noted that under our statute, quoted and cited, [Section 68, Chapter 18, Acts of the Legislature, 1923, now Code, 33-4-7] the condition [prohibiting "other insurance"] obtains even though such other insurance may be invalid. Thus it is evident that the Legislature considered that additional insurance increases the moral hazard though it is invalid, if the fact of such invalidity is unknown to the insured, and in such cases it is to be presumed that he does not know of the invalidity else he would not assume the burden of paying the additional premiums. It follows that plaintiff's effort to meet the difficulty by undertaking to waive, on submission of the case, any benefits he might have under the other insurance, is without avail."

Evidently the plaintiff in this case thought that the Northwestern policy was valid, otherwise, if acting in good faith, she would not have filed her proof of loss

on the Northwestern policy, instituted an action and obtained a verdict thereon. After the fire she filed a proof of loss on the policy and proceeded to a jury verdict on it, and when on the motion for a new trial she was confronted with the difficulty that the policy issued by Continental Insurance Company was vitiated because the Northwestern policy constituted "other insurance", she was guilty of such fraud as was most strongly condemned by the Supreme Court of Nebraska in *Hughes* v. *Insurance Company of North America,* 40 Neb. 626, 59 N. W. 112, in the following very apt language: "The court declines to adopt such jugglery. To permit Hughes [the plaintiff in that action] to say that the Phoenix Insurance Company's policy never had any validity is to permit him to take advantage of his own wrong."

Point 1 of the syllabus in the *Woolpert* case is cited for the proposition that an insurance agent authorized to solicit business for his company is authorized *"pro haec vice* the insurance company" to waive forfeitures and conditions in the policy, and may consent to prior or subsequent insurance on the property. Whether that is a correct principle of law, we need not decide in this case for the reason that this record portrays that the Continental policy and the Northwestern policy were issued by two different insurance agents, operating in different parts of Mineral County, and neither knew that the other agent had issued a policy upon the plaintiff's property; and certainly an agent, if he had the power to do so, cannot waive the breach of a condition of a policy issued by him, where that agent does not know that the condition was, in fact, breached.

Point 2 of the syllabus in the *Wolpert* case is cited by plaintiff's counsel in support of its position that because the agency which issued the Continental policy elected to issue its policy of insurance without any regular application on the part of plaintiff, or without any representation in regard to the title to the property to be insured, it cannot complain after a loss has occurred "that the interest of the insured was not correctly stated in the

policy, or that an existing encumbrance was not disclosed." To the extent that syllabus 2 of the *Wolpert* case seems to sustain plaintiff's position in this regard, it has been overruled in point 1 of the syllabus of *Oliker* v. *Williamsburgh City Fire Insurance Co.*, 72 W. Va. 436, 78 S. E. 746, which reads: "If the property insured by a policy be personal property, and at the time of the contract no written application is required, and none made, and no information or notice is given the insurer or its agent, and there was no inquiry of or representation by the insured respecting the existence or non-existence of chattel mortgages or deeds of trust on the property, and the insurer at or before the delivery of the policy has had no information concerning the same, and the insured accepts the policy, with the affirmative warranties therein against such encumbrances, which by the terms of the policy will render it void, the contract will be enforced according to its terms, unless such warranties be waived, as provided therein, and oral evidence of prior or contemporaneous oral agreements will not be received to vary or contradict the terms of the policy." The rule of the *Oliker* case, though that case involved a warranty against encumbrances should, in our opinion, apply with equal force to the warranty prohibiting "other insurance."

Plaintiff, evidently seeking to sustain the renewal policy of seven thousand dollars issued by Continental, as against the one thousand dollar policy issued by Northwestern National Insurance Company, quotes from 29 Am. Jur., Insurance, Section 738: "In general, the renewal of another and prior policy known by an insurance company to exist does not constitute the procurement of other insurance within a policy inhibition against the same. The renewal is merely a continuation of an existing contract." Whether this is a correct principle of law, we need not decide in this case. However, it seems to be supported by the clear weight of American authority. *Hartford Fire Insurance Co.* v. *Redding*, 47 Fla. 228, 37 So. 62, 67 L. R. A. 518, 110 Am. St. Rep. 118; *Home Insurance Co. of New York* v. *Young* (Tex. Civ. App.), 97 S. W. 2d 360; *American*

*Insurance Co.* v. *Maddox* (Tex. Civ. App.), 60 S. W. 2d 1074; 5 Couch on Insurance, Section 1063; 5 Appleman Insurance Law and Principles, Section 3061. If this action were on the Northwestern policy, and Northwestern National Insurance Company at the time it issued its policy knew of the existence of the original policy issued by Continental Insurance Company, a fact not established by this record, the renewal of the Continental policy on November 12, 1949, would not constitute the procurement of "other insurance" within the prohibitory provision of the Northwestern policy. It seems important to note that at the time plaintiff accepted the renewal policy of Continental Insurance Company, she had accepted and held the Northwestern policy. It was her duty at that time to disclose to the agent of Continental the existence of the other policy.

We are, therefore, of opinion that plaintiff both before and during the pendency and trial of the consolidated cases has ratified the policy of insurance of one thousand dollars issued by Northwestern National Insurance Company. Evidently she thought that the policy was valid, in which event she brought herself within the rule in the *Heldreth* case. If she thought the policy was invalid, and, nevertheless, as she did, filed a proof of loss thereon and proceeded in an action instituted by her to verdict and judgment in her favor on both policies, she was guilty of such fraud as should not be condoned by this Court.

For the foregoing reasons the judgment of the Circuit Court of Mineral County is affirmed.

*Affirmed.*