STATE *ex rel.* OWEN QUEEN, *et al.*

*v.*

BURL A. SAWYERS, STATE ROAD COMMISSIONER, *etc.*

(No. 12222)

STATE *ex rel.* EZRA CHAPMAN, *et al.*

*v.*

BURL A. SAWYERS, STATE ROAD COMMISSIONER, *etc.*

(No. 12223)

Submitted October 1, 1963.    Decided November 26, 1963.

BROWNING, JUDGE, not participating.

*R. H. Burford, Beckett & Burford,* for relator Queen.

*William N. Matthews,* for relator Chapman.

*Anthony G. Halkias, Benjamin A. Ritchie,* for respondent.

CALHOUN, JUDGE:

This case involves two original proceedings in mandamus to compel Burl A. Sawyers, State Road Commissioner of West Virginia, to institute two proceedings in eminent domain to ascertain just compensation for damage alleged to have been caused to two parcels of real estate, separately owned, in Cabell County, as a consequence of the construction of a controlled access highway known as Interstate Route No. 64. Inasmuch as the factual situations and legal questions involved in the two mandamus proceedings are similar, they have been combined for consideration and decision in this Court.

One of the parcels of real estate is owned by Ezra Chapman and Clara Chapman, husband and wife; and the other is owned by Owen Queen and Lennie Queen, husband and wife. A portion of each tract was heretofore acquired by the state road commission for the purpose of the construction of Interstate Route No. 64. The remaining portions of the two tracts are contiguous and both abut

on the north side of the right of way of Interstate Route No. 64.

The landowners base their claim of damage on an assertion that the state road commission gathered surface drainage water in ditches and cast such water in a body on the Queen land by means of two culverts which have been placed under the highway. Reliance in that connection is placed on various authorities, including the following decisions of this Court: *Lindamood* v. *Board of Education,* 92 W. Va. 387, 114 S. E. 800; *Manley* v. *Brown,* 90 W. Va. 564, 111 S. E. 505; *Tracewell* v. *Wood County Court,* 58 W. Va. 283, 52 S. E. 185; *McCray* v. *Town of Fairmont,* 46 W. Va. 442, 33 S. E. 245; *Jordan* v. *City of Benwood,* 42 W. Va. 312, 26 S. E. 266; *Hargreaves* v. *Kimberly,* 26 W. Va. 787; *Knight* v. *Brown,* 25 W. Va. 808; *Johnson* v. *City of Parkersburg,* 16 W. Va. 402; *Gillison* v. *City of Charleston,* 16 W. Va. 282. Water from the two culverts passes over the highway right of way and thence to the Queen land. The landowners assert that the water from the two culverts has caused erosion on the Queen land and a consequent carrying of sediment to the Chapman land.

Counsel for the state road commission have pointed out that cases such as this may result in anomalous or awkward situations from its standpoint in that it may be required by court order to institute eminent domain proceedings to ascertain just compensation in cases in which it is earnestly contended that no property has been taken or damaged for public purposes. Nevertheless, we are committed to the proposition that, in a case of this nature, a writ of mandamus will be awarded if a highway construction or improvement results in "probable damage" to private property. *State ex rel. Cutlip* v. *Sawyers,* 147 W. Va. 687, 130 S. E. 2d 345; *State ex rel. French* v. *State Road Commission,* 147 W. Va. 619, 129 S. E. 2d 831. Conversely, of course, a writ of mandamus will not be awarded in the absence of a proper showing of probable damage of such nature that compensation for it may be determined in an eminent domain proceeding. *State ex rel. Wiley* v. *State Road Commission et al.,* decided No-

vember 5, 1963, 148 W. Va. 76, 133 S. E. 2d 113; *Gardner* v. *Bailey*, 128 W. Va. 331, 36 S. E. 2d 215.

Counsel for the state road commission assert that these proceedings in mandamus are premature inasmuch as the highway construction has not been completed. Reference in that connection is made to Code, 1931, 54-2-14, as amended, which deals with eminent domain proceedings instituted by the state or by any of its political subdivisions and which contains the following language: " * * * but such proceedings shall proceed to final award or judgment after a reasonable time has elapsed for completion of the work upon the particular property * * *." See also *Hardy* v. *Simpson*, 118 W. Va. 440, pt. 2 syl., 190 S. E. 680; *State ex rel. Griggs* v. *Graney*, 143 W. Va. 610, pt. 1 syl., 103 S. E. 2d 878; *State ex rel. French* v. *State Road Commission*, 147 W. Va. 619, syl., 129 S. E. 2d 831; *State ex rel. Cutlip* v. *Sawyers*, 147 W. Va. 687, syl., 130 S. E. 2d 345.

The state road commission also asserts defensively that relief should be denied in these mandamus proceedings, first, because both the Queens and the Chapmans are bound by compromise settlements previously made by them with the commission; and, second, that the damage caused to the two parcels of real estate did not result from the highway construction. We believe that both of such contentions are sustained by the testimony taken in connection with the two mandamus proceedings.

In August, 1960, the state road commission and the state road commissioner instituted in the Circuit Court of Cabell County two proceedings in eminent domain for the purpose of acquiring portions of the Queen and Chapman real estate for highway construction purposes and for ascertaining just compensation to the landowners pursuant to pertinent statutes of this state. The petition in each case made reference to the highway construction plats and plans which had been filed in the office of the Clerk of the County Court of Cabell County, which plats and plans disclosed the locations of two proposed culverts to carry surface drainage water from the right of way to the residue

of the Queen property. Commissioners were appointed by the circuit court to go upon the premises and to ascertain in each of the two cases just compensation for the land proposed to be taken, "as well as for damages to the residue of the said real estate beyond all benefits which will be derived in respect to such residue from the work to be constructed," pursuant to the provisions of Code, 1931, 54-2-9, as amended. All parties in the two cases were represented by counsel.

The eminent domain proceedings were instituted on August 5, 1960. On November 2, 1960, Ezra Chapman and Clara Chapman executed a deed to the state road commission which was based on a consideration of $4,000, and which embodied a compromise settlement of the matters in difference in the eminent domain proceeding. The deed refers to the construction plats and plans "of record in the Office of the Clerk of the County Court of Cabell County," embodies a conveyance of the land involved in the eminent domain proceeding and contains the following additional language: "Grantor further expressly releases all claims of Grantor for damages to any residue of land retained, or adjoining or nearby land owned by Grantor; it being agreed that the compensation herein provided for as purchase price is full compensation for all of the parcels herein described and for all rights and easements hereby released and all damages herein described and which the Grantor has or may hereafter suffer." It does not clearly appear that a court order was entered pursuant to the compromise, but it is reasonable to assume that the eminent domain proceeding was terminated by court action, inasmuch as the Chapmans seek by mandamus to require the state road commissioner to institute a new proceeding in eminent domain in the same court.

The compromise settlement of the matters involved in the eminent domain proceeding in the Queen case is embodied in an order entered by the circuit court in that case on July 27, 1961, which was corrected in some respects by an amended order entered on November 7, 1962. The order dated July 27, 1961, refers to the written report of the commissioners, exceptions of the landowners to such re-

port and the matter coming on to be tried that day by a jury "upon the issues joined between the parties." The order thereafter proceeds to state that the parties by counsel announced to the court "that the parties hereto had agreed upon the settlement of the matters in difference as set forth in the Petition heretofore filed and that the Petitioners and the Defendants have agreed upon a compromise settlement whereby the Petitioners agree to pay for the land, easements and rights of access as described in said Petition the sum of FOUR THOUSAND FIVE HUNDRED ($4,500.00) DOLLARS * * * and that the Defendants have agreed to accept as full compensation for the land proposed to be taken, the easements and rights of access thereto, as described in said Petition, * * *." The order makes reference to the plat and plans "filed in the Office of the County Court of Cabell County."

Statutes of this state fix the issues involved in an eminent domain proceeding as a determination of just compensation for the land taken as well as damage to the residue beyond all benefits which will be derived in respect to the residue from the work to be constructed. Neither the deed nor the order makes any exception or reservation concerning the embracive and inclusive nature of the compromise. The Chapman deed expressly states that the "Grantor" releases all claims "for damages to any residue of land retained, or adjoining or nearby land owned by the Grantor; * * *."

"An adjudication by a court having jurisdiction of the subject-matter and the parties is final and conclusive not only as to the matters actually determined, but as to every other matter which the parties might have litigated as incident thereto and coming within the legitimate purview of the subject-matter of the action. It is not essential that the matter should have been formally put in issue in the former litigation, but it is sufficient that the status of the suit was such that the parties might have had the matter disposed of on its merits." *Alderson* v. *Horse Creek Land Co.*, 81 W. Va. 411, pt. 1 syl., 94 S. E. 716; *In re: Estate of Amanda Nicholas*, 144 W. Va. 116, 107 S. E. 2d 53. The same principles apply in case of a court order

which records a compromise settlement of a pending action. *Re Settlement of the Estate of Frederick F. McIntosh, Sr.,* 144 W. Va. 583, 590, 109 S. E. 2d 153, 158; *Ohio River Railroad Co.* v. *Johnson,* 50 W. Va, 499, 40 S. E. 407. See also annotations in 2 A. L. R. 2d 514, and 97 L. ed. 1188, dealing with the *res judicata* effect of consent judgments, or of court orders recording compromise settlements of pending cases. See also 30A Am. Jur., Judgments, Sections 144-155, pages 253-261; 49 C.J.S., Judgments, Section 178, page 314. "A judgment by consent is binding and conclusive and operates as res judicata and as an estoppel to the same extent as judgments after contest." 30A. Am. Jur., Judgments, Section 148, page 255. See also *Dudash* v. *State Compensation Commissioner,* 145 W. Va. 258, 260, 114 S. E. 2d 475, 477; 50 C.J.S., Judgments, Section 630, page 55; *Hinton* v. *Norfolk & Western Railway Co.,* 137 Va. 605, 120 S. E. 135; *Culpeper National Bank* v. *Morris,* 168 Va. 379, 191 S. E. 764. "An order dismissing a case agreed is a bar to another suit on the same cause of action." *Pethtel* v. *McCullough,* 49 W. Va. 520, pt. 1 syl., 39 S. E. 199. See also *Fletcher* v. *Parker,* 53 W. Va. 422, 425, 44 S. E. 422, 423; *Gamble* v. *Kennedy,* 80 W. Va. 694, 697, 93 S. E. 807, 808; *Simmons* v. *Yoho,* 92 W. Va. 703, 720, 115 S. E. 851, 857. For other cases dealing with consent orders or decrees, see *Blair* v. *Dickinson,* 136 W. Va. 611, 68 S. E. 2d 16; *McKnight* v. *Pettigrew,* 141 W. Va. 506, 91 S. E. 2d 324. "A valid agreement of compromise and settlement is a merger and bar of all preexisting claims." 15 C.J.S., Compromise and Settlement, Section 24, page 739. For reasons stated, the Court holds that the parties compromised and settled all matters and issues which were properly embraced by and litigable in the two proceedings in eminent domain which were pending in the circuit court when the compromise settlements were made.

The landowners, relying upon that which we believe to be an *obiter dictum* statement in *Tracewell* v. *County Court of Wood County,* 58 W. Va. 283, 290, 52 S. E. 185, 188, contend that the discharge of water on the Queen land amounts to a "taking", notwithstanding the additional words "or damaged" in our present Constitution. We be-

lieve this contention is untenable. *McCray* v. *Town of Fairmont*, 46 W. Va. 442, 33 S. E. 245; 2 Nichols on Eminent Domain, Section 6, 4431, pages 336-337; 29 C.J.S., Eminent Domain, Section 111, page 921. The distinction between a taking and a mere infliction of damages is carried into recent opinions of this Court. *State ex rel. Cutlip* v. *Sawyers*, 147 W. Va. 687, 130 S. E. 2d 345; *State ex rel. French* v. *State Road Commission*, 147 W. Va. 619, 129 S. E. 2d 831; *State ex rel. Griggs* v. *Graney*, 143 W. Va. 610, 103 S. E. 2d 878.

From Interstate Route No. 64 and from the point where the two culverts empty on the right of way, the surface of the Queen land, prior to the commencement of the highway construction, sloped downward in a northerly direction to Newman's Branch, a small natural stream of water which flowed westward over the Queen land to the Chapman land. It is conceded that there is a draw or a low place of slight and gradual proportions over which, prior to the commencement of the highway construction, surface water drained naturally northward over the Queen land to Newman's Branch from the area where water from the more westerly culvert is discharged on the right of way. We believe that the clear preponderance of the evidence establishes also the fact that there is a similar draw or drainage area through which, prior to the commencement of the highway construction, water drained naturally in a northerly direction across the Queen land to Newman's Branch from the area at which water from the more easterly culvert is discharged on the right of way. Surface water, during "wet weather" periods, was diffused or spread out over these natural drainage areas through grass, weeds and other vegetation. The water did not run in restricted courses so as in any sense to create streams of water and, if any erosion resulted, it was not of sufficient consequence to disturb the natural vegetation which covered the surface of the ground in such areas.

The contract for the highway construction in the area involved in this case was awarded to Howard Price & Company. By a writing dated November 15, 1960, the contractor was given permission by the Queens "to waste

top-soil material and/or unclassified excavation" on the Queen land in an area adjacent to the right of way. The waste deposit consisted of silty, highly erosive material resulting from excavation which would not compact or pack, and hence it was not suited for purposes of highway construction. By the terms of its contract, the contractor was required at its own expense to remove this waste material from the right of way and to arrange for a place to deposit it. The writing by which the contractor was given permission to deposit the waste material on the Queen land required the contractor to dress the waste deposit "to a sloping grade to provide normal drainage," but the contractor was not "required to seed, mulch, fertilize or otherwise improve" the area in any other manner. The waste deposit covered an area of 5 2/3 acres. It was comparatively level on top, except that it had a slight slope downward in a southward direction toward the highway.

Before the deposit of waste material was made, Owen Queen placed a twelve-inch galvanized pipe in Newman's Branch across almost the entire Queen tract and to a point near the Chapman line. This pipe was covered by the waste deposit or fill, except a portion thereof nearest the Chapman property. In a short while, a considerable erosion commenced from the top of the fill and from its eastern, western and northern sides. The pipe under the waste deposit soon became clogged and it became necessary for Mr. Queen to open it several times. Eventually the pipe became completely clogged at its eastern end. There resulted a sizeable impoundment of water which backed up on adjacent land to the east belonging to a man named Johnson. Johnson either sued or threatened to sue the Queens, whereupon they engaged the services of somebody to construct a ditch by the use of heavy machinery. This ditch extended through the fill of loose waste material at its northern edge, near to but perhaps slightly northward from the location of the drain pipe which is under the fill. The result was that the sizeable impoundment of water was released through this ditch across the Queen land to the Chapman land. This ditch apparently has since carried the water which once was carried through Newman's Branch.

Water discharged from one culvert flows down past the eastern edge and water discharged from the other culvert flows down past the western edge of the waste deposit. A gully leads from the top of the waste deposit southward to a point near the right of way, and continues in a course parallel to the right of way to a point near where water is discharged from the more westerly culvert. From that point erosion or surface water has created a gully down past the western side of the waste deposit toward Newman's Branch. This gully or ditch, as a result of erosion, has become quite large. It is conceded that none of the water carried in this gully or ditch comes from either culvert during its course on the top of the waste fill and parallel to the highway until it reaches the point where water enters the ditch from the more westerly culvert. It appears from a clear preponderance of the evidence that, during the process of depositing the waste fill and during the process of the construction of the ditch along its northern edge, the natural vegetation was disturbed or destroyed and the surface or topsoil was scoured by heavy machinery around all sides of the waste fill in such a manner and to such an extent that all such areas have been made readily susceptible to erosion.

A short distance westward and downstream from the Queen land, the Chapmans have constructed two ponds on their land in the path of Newman's Branch. The upper one of these, the smaller one, has become filled with sediment, silt or earth washed there from the Queen land. The lower and larger pond is gradually filling in the same manner. Owen Queen cut down one or more trees which were placed on the Queen land at a point near where it adjoins the Chapman land. A considerable amount of sediment carried by surface water has lodged against the tree or trees thus placed and against the line fence.

It is obvious that the ponds were beautiful and added much to the Chapmans' enjoyment of life and to the value of their property, not only because of the beauty of the ponds but also because of fishing and other recreational activities which they made available. It is this damage to the ponds which forms the primary basis of complaint

on the part of Mr. and Mrs. Chapman. The complaint of Mr. and Mrs. Queen is based primarily on erosion which has resulted to their land, particularly along the eastern and western sides of the waste deposit.

The testimony and exhibits disclose that, if the highway construction has caused any increase in the volume of surface water discharged on the Queen land, the increase is negligible. The construction contract calls for concrete aprons or ditches to carry water from the culverts over the right of way in such a manner that it will be diffused as it enters on the Queen land. The contract also calls for the seeding of the portion of the right of way not embraced in the actual highway. The completion of these parts of the contract has been delayed by the fact that the contract with Howard Price & Company was terminated and a contract for completion of the project was awarded to a different contractor. The testimony discloses that the plans for the construction of the highway, including the installation of the culverts, are in accordance with sound principles of engineering and of highway construction.

We have observed previously that the landowners were notified by means of the eminent domain petitions that the proposed construction would be in accordance with the plans and plats which were filed in the office of the clerk of the county court, and which provided for two culverts. Furthermore, it is common knowledge that highway construction necessarily involves drainage problems and that surface water from highway rights of way is necessarily discharged on adjacent areas by means of gravity flow. It was obvious to everybody concerned, including the landowners in these two cases, that the Queen land, prior to the commencement of the construction, furnished a natural drainage course for surface water in the area and that such situation would necessarily continue after the construction was commenced and completed.

The landowners acknowledge that erosion has resulted from the top of the fill and from its eastern, western and northern sides, and in the ditch constructed through the northern portion of loose, silty, highly erosive waste de-

posit. None of this erosion and consequent washing of sediment resulted from the highway construction itself or from surface water originating on the right of way. A photograph made an exhibit with the testimony shows a portion of the fill near the point where Newman's Branch enters the Chapman land, not far from the upper, smaller pond. The fill at that point appears to be quite high, perhaps ten feet or higher. The photograph discloses small gullies made by erosion on the steep side of that portion of the fill. The sediment caused by this erosion necessarily reached Newman's Branch near the point where it enters the Chapman land.

We believe it appears from a clear preponderance of the evidence that it is quite unlikely that the Chapmans would have suffered damage from the carrying of sediment to their land, or that the Queens would have suffered the damage of which they complain, from the mere highway construction project; and that such damage was caused predominently, even if not entirely, by the deposit of the silty, highly erosive waste material on the Queen land, the scouring of the natural topsoil and destruction of vegetation by heavy machinery on all sides of the waste fill, the construction of the ditch through the silty, highly erosive waste material and the release of the great volume of impounded water through the ditch. All of these things resulted from acts done pursuant to private contracts or arrangements to which the state road commission was not a party. In the circumstances of this case, an award of compensation to the landowners by commissioners in an emiment domain proceeding, or by a jury in the circuit court, would necessarily be based on pure speculation or conjecture as to what amount of damage, if any, would have resulted to the landowners if the waste deposit had not been made on the Queen land. Even in a proceeding of this nature, we cannot lose sight of the well-settled legal proposition that a writ of mandamus will not be awarded except on a showing of a clear legal right. Commissioners' awards, jury verdicts and court judgments must be predicated upon proof disclosing more than a basis of mere speculation or conjecture. *Payne* v. *Ace House Movers,*

*Inc.,* 145 W. Va. 86, 91, 112 S. E. 2d 449, 451; *State ex rel. Shatzer* v. *Freeport Coal Co.,* 144 W. Va. 178, pt. 4 syl., 107 S. E. 2d 503; *Ritz* v. *Kingdon,* 139 W. Va. 189, pt. 20 syl., 79 S. E. 2d 123; *Oates* v. *Continental Insurance Co.,* 137 W. Va. 501, pt. 1 syl., 72 S. E. 2d 886; *Legg* v. *Junior Mercantile Co.,* 105 W. Va. 287, syl., 142 S. E. 259; *Chambers* v. *Spruce Lighting Co.,* 81 W. Va. 714, pt. 6 syl., 95 S. E. 192; *Moore* v. *West Virginia Heat & Light Co.,* 65 W. Va. 552, pt. 1 syl., 64 S. E. 721; 88 C.J.S., Trial, Section 208, pages 429-30.

The Court holds that the landowners have not shown a clear legal right to the relief they seek in these mandamus proceedings. It becomes unnecessary, therefore, to determine whether such proceedings are premature.

For reasons stated, the writs of mandamus are denied.

*Writs denied.*